**No. 23-80074**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ZUFFA, LLC,
D/B/A ULTIMATE FIGHTING CHAMPIONSHIP AND UFC,

*Defendant-Petitioner*,

v.

CUNG LE, ET AL.,

*Plaintiffs-Respondents*.

On Petition for Permission to Appeal from the United States District
Court for the District of Nevada (No. 15-cv-1045)
The Hon. Richard F. Boulware, J.

_____

**RESPONDENTS' ANSWERING BRIEF OPPOSING PETITION FOR
PERMISSION TO APPEAL FROM ORDER GRANTING CLASS
CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(f)**

_____

JOSHUA P. DAVIS
BERGER MONTAGUE PC
*505 Montgomery Street, Suite 625*
*San Francisco, CA 94111*

ERIC L. CRAMER
BERGER MONTAGUE PC
*1818 Market St., Suite 3600*
*Philadelphia, PA 19103*

JEROME K. ELWELL
WARNER ANGLE HALLAM
JACKSON & FORMANEK, PLC
*2555 E. Camelback Rd., Suite 800*
*Phoenix, AZ 85016*

RICHARD ADAM KOFFMAN
BENJAMIN D. BROWN
COHEN MILSTEIN SELLERS &
TOLL, PLLC
*1100 New York Ave., N.W., Suite 500*
*East, Tower*
*Washington, DC 20005*

JOSEPH R. SAVERI
KEVIN E. RAYHILL
JOSEPH SAVERI LAW FIRM, INC.
*601 California St., Suite 1000*
*San Francisco, CA 94108*

# Table of Contents

INTRODUCTION ................................................................................1

BACKGROUND AND  CLASS CERTIFICATION PROCEEDINGS ...................6

SUMMARY OF THE ARGUMENT ....................................................10

REASONS FOR DENYING THE PETITION .......................................11

I.    THE DISTRICT COURT CORRECTLY CERTIFIED A CLASS BASED ON THE WELL-ESTABLISHED ECONOMIC CONCEPT OF WAGE SHARE, WHICH PLAINTIFFS USED TO SHOW COMMON IMPACT IN THE MANNER APPROVED BY *OLEAN* ...........................................12

    A. Plaintiffs Have Presented A Common Method For Demonstrating Individual Antitrust Impact Across The Class.......................................12

    B. Dr. Singer's Regression Model Distinguished Between the Impact of Procompetitive and Anticompetitive Conduct......................................16

    C. Zuffa Fails to Address the Extensive Documentary and Econometric Evidence of Its Pay Structure...................................................17

II.    THE DISTRICT COURT APPROPRIATELY CERTIFIED A CLASS BASED ON A MODEL THAT CONVINCINGLY DEMONSTRATED COMMON IMPACT ...................................................................17

III.    THE DISTRICT COURT SHOULD NOT HOLD THE PETITION PENDING ANY UNRELATED DECISION IN *GOOGLE PLAY*............18

IV.    THE QUESTIONS AT ISSUE IN THIS CASE WERE RESOLVED BY *OLEAN*, WERE WAIVED BY ZUFFA, LACK AN EVIDENTIARY BASIS, AND CAN MOST EFFICIENTLY BE ADDRESSED AFTER TRIAL ..............................................................................19

V.    ZUFFA'S CONDUCT IN THE DISTRICT COURT CONFLICTS WITH ITS CLAIM THAT IT FACES GREAT PRESSURE TO SETTLE BEFORE TRIAL.................................................................22

CONCLUSION .............................................................................23

Form 8. Certificate of Compliance for Briefs.......................................26

# Table of Authorities

**Page(s)**

**Cases**

*Alston v. NCAA*,
    141 S. Ct. 2141 (2021)......................................................................20

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................8

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)......................................................................12

*In re Capacitors Antitrust Litig. (No. III)*,
    No. 17-md-2801, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ......................19

*Davidson v. O'Reilly Auto Enterprises, LLC*,
    968 F.3d 955 (9th Cir. 2020) ..............................................................14

*In re Google Play Store Antitrust Litig.*,
    No. 21-md-2981, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) .............18, 19

*In re Google Play Store Antitrust Litig.*,
    No. 21-md-2981, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ......................19

*In re Google Play Store Antitrust Litig.*,
    No. 23-15285, ECF No. 123 (9th Cir. August 31, 2023) ..................................19

*In re High-Tech. Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013)................................................12

*In re NCAA I-A Walk-On Football Players Litig.*,
    No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006)......................15

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    No. C 09-1967, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ..........................15

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods
    LLC*, 31 F.4th 651 (9th Cir.) (*en banc*), *cert. denied*,
    143 S. Ct. 424 (2022).................................................................passim

*Shields v. Federation Internationale de Natation*,
No. 18-cv-7393, 2022 WL 425359 (N.D. Cal. Feb. 11, 2022)...........................15

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ..............................................................12

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982) ...............................................................5

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)..........................................................................12

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) .............................................................12

*White v. NCAA*,
No. 06-cv-999, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006)......................4, 20

**INTRODUCTION**

Zuffa, LLC ("Zuffa") seeks interlocutory appellate review under Rule 23(f) of the district court's order certifying a class of MMA fighters (the "Order"). But rather than engage with the district court's rigorous and careful analysis, Zuffa attacks a strawman.

Zuffa does not address Plaintiffs' extensive evidence in support of class certification—evidence that parallels and exceeds the plaintiffs' showing in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir.) (*en banc*), *cert. denied*, 143 S. Ct. 424 (2022).

Nor does Zuffa contend with the district court's seven-day certification hearing during which Zuffa's factual claims unraveled.

Under Rule 23(f), Zuffa concedes that it must show that the Order is manifestly erroneous, presents an unsettled fundamental class certification issue, or is questionable. Petition 9. To do that, Zuffa must establish an abuse of discretion, *Olean*, 31 F.4th at 663, or clear factual errors. *Id*. Zuffa fails to do so, ignoring the Order, the evidence, and governing law.

At the heart of the Order is the district court's finding that Plaintiffs presented more persuasive expert testimony than Zuffa did. Order 11-14 (ECF 839) (Plaintiffs' experts reliable); *id*. at 51-59 (defense experts unreliable and unpersuasive). The district court found compelling the analysis of Dr. Hal Singer.

1

He established that Zuffa's alleged violation of Section 2 of the Sherman Act harmed all or virtually all 1,200 or so members of the class of former Zuffa fighters. Order 11-14, 21-23, 47. That alleged violation involved locking up Zuffa's MMA fighters in long-term exclusive contracts (the "Contracts"), including through coercion and acquiring rivals (together, the "Scheme"). Order, *e.g.*, 7-9, 21-23, 33-44. The Scheme foreclosed competitors who otherwise would have bid for fighters' services. *Id*. 9-10, 29-30, 39-44, 57-58.

*Regression Analysis*. Dr. Singer used a regression to show that as the share of the market subject to Zuffa's anticompetitive Contracts ("Foreclosure Share") increased, Zuffa paid its fighters a declining percentage of the revenues from its events ("Wage Share"). Order 21-23, 43-71. In short, Zuffa reduced its Wage Share by unlawfully increasing its Foreclosure Share. Dr. Singer's regression analysis proved the Scheme enabled Zuffa to underpay 99% or more of class members. Order 48-51, 16.

Zuffa claims that Plaintiffs allege it violated the antitrust laws "by not increasing the compensation of fighters in direct proportion to Zuffa's growth in revenues." Petition 1. That is Zuffa's invention. Its antitrust violation was the Scheme—the Contracts, coercion, and acquisitions. Order 21-44. Dr. Singer's regression *tested empirically* whether what drove down Zuffa's Wage Share was its Scheme or its procompetitive conduct. Order 21-23, 44-63, 70. He concluded,

and the district court found, that the cause was Zuffa's Scheme, Order 51 & 70, not some "nebulous" procompetitive "special sauce of promotion." Order 29, 70.

*Wage Share*. Zuffa asserts that the district court's endorsement of Wage Share is "radical," lacking any precedent in economics or law. Petition 1, 14-15. Untrue. As the district court found, use of Wage Share is *standard* in sports economics. Order 52-57. The reason is that unlike ordinary workers, athletes' identities—particularly in individual sports like MMA—directly affect revenues. *Id*. at 48-49, 54-55. Dr. Topel, a Zuffa testifying economist, has employed Wage Share in analyzing the market power of the NFL vis-à-vis its players. *Id*. at 55-56. So did Zuffa in assessing its fighter costs, Order 54, and in comparing itself to other sports leagues. *Id*. Further, Dr. Topel and another Zuffa economist, Dr. Blair, *admitted* that Wage Share could properly be used to assess growing monopsony power over time—the relevant issue here. Hearing Transcript ("HT") 2-147:3-25 (ECF 726); HT 3-55:1-56:5 (ECF 730); HT 5-20:11-24:1 (ECF 741).

Zuffa speculates that the district court's reliance on Wage Share could lead to a torrent of similar lawsuits. Petition 2, 21. Zuffa is incorrect. The district court's reasoning applies only to professional athletes, not ordinary workers. Order 49, 54-56, 58 (describing the "very specific and unique labor market" at issue). Second, a court has already relied on Wage Share to certify a class without causing

3

the predicted flood. *White v. NCAA*, No. 06-cv-999, 2006 WL 8066803, at *5 & n.4 (C.D. Cal. Oct. 19, 2006).

Zuffa claims that it is aware of no court using Wage Share, much less doing so in certifying a class. Petition 20-21. Yet Plaintiffs repeatedly cited to *White* below, Reply in Supp. of Pls.' Mot. for Class Certification ("Reply") 8-9 (ECF 554), a case that certified a class of NCAA athletes based on a comparison between Wage Shares in different sports. The district court did not err in finding that Plaintiffs appropriately relied on Wage Share. Order 52-57.

*Foreclosure Share*. Dr. Singer used Foreclosure Share—the percentage of the market that Zuffa locked up with long-term Contracts, as opposed to contracts of shorter duration—to test the effects of Zuffa's Scheme.[1] Order 49-51, 57-59, 70.

Zuffa argues that this use of Foreclosure Share "assumes the existence of illegal conduct." Petition 2. Incorrect. Dr. Singer's regression showed *empirically* that Zuffa's increasing Foreclosure Share enabled it to suppress the Wage Share, HT 1-75:12-76:10, 138:23-139:16 (ECF 724); Rebuttal Report of Hal J. Singer ("Singer Rebuttal") ¶¶3, 73, 75 n.274 (ECF 518-4), and the district court agreed. Order 52-59, 70.

---

[1] Foreclosure Share captured the effects of all Zuffa's anticompetitive conduct because its other actions—coercion of fighters and acquisition of rivals—harmed competition by funneling fighters into Zuffa's Contracts. Order 40-43.

Dr. Singer's use of Foreclosure Share is a standard way to assess the potential for exclusionary agreements to harm competition. It complies with Ninth Circuit law. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982); *id*. at 1298 n.5; Order 42, 58. It also finds support in the standard economic view that exclusive dealing can harm competition by depriving rivals of access to a key input. Pls.' Summ. J. Opp. ("SJ Opp.") 36 (ECF 596). The district court did not err when it found that Zuffa foreclosed rivals from the market by locking up top-level fighters to long-term Contracts. Order 57-59, 34-39.

Zuffa claims Plaintiffs do not explain how Zuffa's Contracts excluded rivals from the market. Petition 18-19. False. The district court found that the Contracts lasted for as long as the average fighter's career—about 30 months—and in practice as long as Zuffa wanted. Order 57-59, 34-39. That deprived potential rivals of the critical mass of elite fighters necessary to compete with Zuffa. *Id*. at 30-33.

*Alleged Individualized Issues*. Zuffa contends that Dr. Singer's model "erroneously glossed over individualized differences in contracts." Petition 2. Incorrect. As the district court found, Zuffa's treatment of fighters was essentially uniform, Order 43-44, 34-35, and Dr. Singer's regression captured differences between fighters by incorporating a "staggering number of control variables" that

5

"control[led] for all a fighter's individual-specific attributes." Order 50. Further, Dr. Singer compared the pay each fighter received in each bout to the pay the fighter would have received without the Scheme. Expert Report of Hal J. Singer ("Singer Report") ¶¶230-31 & Tbl.8 (ECF 518-3); Pls.' Class Br. ("Class Br.") 19 & 26 (ECF 518). The district court found that analysis showed Zuffa's Scheme harmed at least 99% of the class members. Order 16, 63-67.

*Causation*. Zuffa argues that Dr. Singer's regression cannot determine whether Zuffa's Scheme reduced its Wage Share or whether its procompetitive conduct, such as investing in promotion, did. Petition 1-2, 16-17. Untrue. Dr. Singer determined that Zuffa's investments in promotion were *falling over time*, and so could not explain the fighters' decreasing Wage Share. Pls.' Supplemental Br. in Supp. of Class Certification ("Supplemental") 12 (ECF 744); Order 70, 29, 50. Controlling for those investments did not disturb his findings. *Id*. In response, Zuffa offered only unsubstantiated speculation about "promoter acumen" and its "special sauce of promotion." Order 29. The district court rightly rejected Zuffa's evidence-free hand-waving. *Id*. at 70, 29.

## BACKGROUND AND CLASS CERTIFICATION PROCEEDINGS

Zuffa promotes live mixed martial arts ("MMA") events under the names "Ultimate Fighting Championship" and "UFC." Order 1. The UFC is the dominant MMA promoter in North America. *Id*. Its former President described it as the

"[expletive] NFL," SJ Opp. 2, and a key executive touted that the UFC "own[s] MMA" because it had locked up the top fighters. Order 32. Zuffa's executives characterized the other promoters that Zuffa had not bought and shut down as "feeder" leagues. Order 29-30; 43-44.

*The Scheme*. The district court found credible Plaintiffs' extensive evidence that Zuffa acquired and maintained its market power through anticompetitive means. Order 23-48. Importantly, a promotion would need a critical mass of top fighters to compete with Zuffa. *Id.* at 32, 34-39.

Zuffa engaged in anticompetitive conduct to ensure that no other promoter could offer elite fighters, or aspiring elite fighters, sufficient attractive opponents. Order 7-8, 31-43, 57. First, Zuffa forced its fighters to enter long-term exclusive Contracts. *Id*. The fighters could compete only in Zuffa events. *Id*. Zuffa would not engage in copromotion, so non-Zuffa fighters could not improve their reputations through bouts with Zuffa fighters. Order 31-33; SJ Opp. 5 n.9. Second, Zuffa's contractual provisions and coercion ensured its Contracts were in practice perpetual. Order 33, 35-39, 57. Its coercion included forcing fighters to renew their Contracts before they expired on pain of sitting idle and unpaid or facing dangerous and unprestigious opponents. Order 35-39, 57. Third, Zuffa acquired its rivals, locking their fighters into long-term Contracts. Order 9-10, 32-33, 39-43.

The district court referred to this combination of anticompetitive conduct as Zuffa's "Scheme." Order 2.

*Class Certification, Predominance, and Common Impact.* The crux of class certification in most antitrust actions, including *Olean*, is whether common issues predominate for purposes of Rule 23(b)(3). *Olean*, 31 F.4th at 670. Whether a defendant violated the antitrust laws is common to the class, so courts routinely find predominance if plaintiffs offer common evidence capable of showing injury that is widespread across class members—often referred to as common impact. *Id.*; *cf. Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust laws.")

The district court found that Plaintiffs' evidence *did* prove common impact. Order 43-67, 16. That evidence includes a primary multivariate regression analysis (the "Regression"), other statistical analyses, Zuffa's business records, witness testimony, and Zuffa's and its experts' admissions. *Id.*

*The Regression.* A regression is a standard statistical technique for satisfying common impact. Order 13; *Olean,* 31 F.4th at 671. It allows an econometrician to determine how changes in one variable—such as anticompetitive conduct—affect another variable—such as Wage Share. Order 13. Dr. Singer's Regression controlled for the attributes of each fighter, each bout, and more to assess the effects of Zuffa's Scheme on fighter compensation. *Id.* at 48-51, 70.

8

Dr. Singer measured fighter compensation using Wage Share. He isolated the effects of Zuffa's Scheme by using Foreclosure Share—the share of fighters in the market who were locked up by Zuffa's Contracts. Order 34-35, 57-59.

*Other Evidence of Common Impact*. Dr. Singer performed other statistical analyses establishing common impact. Order 63-65.

Individualized Regression Results. Dr. Singer confirmed common impact by using his Regression to assess whether each individual fighter was underpaid in each individual bout, accounting for over 1,000 factors relating to fighters, bouts, and more. Order 50-51, 61-63, 70; HT 1-169:11-19, 184:22-185:6, 227:23-229:6. He found that at least 99% of class members had been underpaid because of the Scheme, Order 67, as compared to the 94% of class members for which the same methodology corroborated injury in *Olean*. 31 F.4th at 672.

Pay Structure. Dr. Singer confirmed common impact through evidence of a pay structure. Order 63-65; 7-9. Case law recognizes that if prices—including payments to workers—significantly correlate to each other, then conduct that affects prices will have a classwide impact. Olean, 31 F.4th at 672-73. Dr. Singer's econometric analyses demonstrated that Zuffa had a pay structure, fighter compensation moved together, and its Scheme had classwide effects. Order 63-66, 7-9.

9

Plaintiffs also identified extensive documentary evidence that Zuffa maintained "pay equity" by compensating comparable fighters similarly and fighters at different levels of success in a relatively fixed ratio to one another. Order 63-66, 7-9. For example, Zuffa's "Chief UFC Matchmaker, Mr. Silva, explained, '[a]s I said, I have a pay structure. I cannot mess it up for 1 fighter. I have to justify that to all the other managers. . . It's great if other people want to pay him more but that's not how my business model works." Order 64. The district court found that the documentary evidence "separately and independently establishes class-wide impact." *Id*.

*Daubert Motions*. Zuffa moved to exclude the testimony of all Plaintiffs' experts other than Dr. Alan Manning, which the district court denied. Order 12-13.

## SUMMARY OF THE ARGUMENT

Interlocutory review under Rule 23(f) is inappropriate because:

(1) *Olean controls*. Zuffa's opposition to class certification was premised on arguments this Court rejected in *Olean*. Zuffa emphasized those similarities in the district court. HT, May 5, 2021, 8:1-17 (ECF 815). By the time the district court issued its Order, it was too late for Zuffa to pivot, although its Petition tries to do so by making factual assertions at odds with the record below.

(2) *Extraordinarily Rigorous Process*. The class certification process was extraordinarily rigorous based on: (a) complete class and merits discovery; (b) eighteen expert reports; (c) four rounds of briefing; (d) a seven-day hearing with testimony from six economists and a percipient witness; and (e) oral argument. Order 4, 21. During litigation and the hearing, Zuffa's factual claims fell apart, including because of its witnesses' admissions.

(3) *Counterproductive Interlocutory Appeal*. An interlocutory class appeal would cause unproductive delay. This litigation has lasted almost nine years because of the pandemic and awaiting resolution of the closely related proceedings in *Olean*. Partly in recognition of that, the district court has ruled that trial will begin in March or April 2024. ECF 847. As a result, an interlocutory appeal would begin only a few months earlier than a potential post-trial appeal on the merits, yet it could delay trial for years.

## REASONS FOR DENYING THE PETITION

The Order was careful, correct, and consistent with *Olean*. It is reviewed for abuse of discretion. *Olean*, 31 F.4th at 663. So is its "determination that a statistical regression model, along with other expert evidence, is capable of showing class-wide impact." *Id*. And its factual findings are reviewed for clear error. *Id*.

11

## I. THE DISTRICT COURT CORRECTLY CERTIFIED A CLASS BASED ON THE WELL-ESTABLISHED ECONOMIC CONCEPT OF WAGE SHARE, WHICH PLAINTIFFS USED TO SHOW COMMON IMPACT IN THE MANNER APPROVED BY *OLEAN*

Plaintiffs satisfy the predominance requirement of Rule 23(b)(3) if they show that common issues predominate in a case as a whole. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 460 (2013); *Olean,* 31 F.4th at 664; *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1134 (9th Cir. 2016). Courts routinely certify classes in antitrust cases if plaintiffs offer common evidence capable of proving classwide impact, as they have done here in the same manner as the plaintiffs did in *Olean*. *E.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-56 (10th Cir. 2014); *In re High-Tech. Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1222-23 (N.D. Cal. 2013).

### A. Plaintiffs Have Presented A Common Method For Demonstrating Individual Antitrust Impact Across The Class

Zuffa's argument on common impact is a frontal assault on *Olean*. There, this Court held that each member of a proposed class can rely on a regression analysis to show injury, so that a regression by itself can provide common evidence of classwide impact. *Olean*, 31 F.4th at 683. Here, Dr. Singer performed a regression analysis on which each fighter can rely to prove injury. Reply 6-7, 13-

12

14; Order 66-67. Under *Olean*, Plaintiffs have offered common evidence capable of proving classwide injury.

Zuffa mischaracterizes Dr. Singer's statistical analyses that the district court found reliable. Order 51. It pretends that Dr. Singer relied solely on a single regression result to prove classwide impact. He did not. One of Dr. Singer's many analyses used a regression to calculate the amount of the underpayment *each* fighter suffered for *each* bout. The district court found that regression included a "staggering number of control variables," capturing variations by fighter, bout, and event. Order 50, 70. Dr. Singer's analysis confirmed injury to all but a dozen or so members of the class of about 1,200 fighters—all but 1% or less of the class. Dr. Singer explained he could identify the small number of members for which this analysis could not corroborate injury, Order 66-67 & 16, that they did not contribute to aggregate damages because the model did not indicate they were harmed, Supplemental 6, and that they likely were injured, even though this particular model did not so confirm. *Id*.; Order 63-65.

Zuffa asserts that Dr. Singer failed to consider the circumstances of individual fighters. Petition 11-12. Wrong. The district court correctly found Dr. Singer's regressions controlled for the unique characteristics of each fighter. Order 50, 63.

13

Zuffa also relies on a new argument about conflicts of interest that its appellate lawyers concocted, that lacks evidentiary support, and that Zuffa waived. *Davidson v. O'Reilly Auto Enterprises*, *LLC*, 968 F.3d 955, 966 (9th Cir. 2020) (new appellate arguments waived). Zuffa makes the argument without a single citation to the record below—not even as a fig leaf. Petition 12-14.

Zuffa's new conflict argument assumes that if it had not engaged in the Scheme, it would have paid less per bout to some fighters and others would have competed for other promoters for less compensation than Zuffa paid. *Id*. Even putting aside waiver, Zuffa provides no support for those assumptions.

Plaintiffs offered expert testimony, based on an extensive academic literature, showing that increasing competition for athletes' services in a sport enhances their compensation generally. Supplemental 15, n.34; Expert Report of Andrew Zimbalist ("Zimbalist") (ECF 518-5) ¶29. That happened with the advent of free agency or its equivalent in MLB, the NFL, the NBA, the NHL, and professional boxing. *Id*. ¶¶29, 39, 52, 62, 71, 95; Singer Report ¶¶286-290. The owners in those sports issued dire predictions if they could not maintain monopsony power. All proved incorrect. The record below confirms that competition in the marketplace—like competition in the Octagon—improves the quality and popularity of a sport and makes it more lucrative for athletes across the board. Zimbalist ¶¶80-84. Further, one of Zuffa's economists, Dr. Topel, conceded

14

that eliminating the challenged contractual provisions would create "a transfer of wealth from Zuffa to its fighters," Class Br. 24 (quoting Ex. 23 (Topel Dep.) 76:4-77:3, 82:9-84:18), as well as to fighters from *other MMA promotions*. *Id*. at 84:11-18.

The precedents Zuffa cites (Petition 12-14) are rendered inapposite by the district court's finding of classwide impact. In *In re NCAA I-A Walk-On Football Players Litigation*, 2006 WL 1207915 (W.D. Wash. May 3, 2006), the court was concerned because only some class members would have received scholarships in the absence of an antitrust violation, and it was unclear which ones would have. *Id*. at *7-9. This issue arises in so-called "*absence of dealing*" cases, *id*. at *7, where defendants would have engaged in a beneficial transaction with some but not all class members. *Shields v. Federation Internationale de Natation*, 2022 WL 425359, at *7 (N.D. Cal. Feb. 11, 2022) (appeal filed) (following *Walk-On Litigation* and noting only some class members would have received compensation in absence of antitrust violation); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *9 (N.D. Cal. Nov. 8, 2013) (same). That issue does not arise here because Zuffa *did deal* with all the class members, and Dr. Singer showed that without the Scheme all could and would have received more money. Order 63-66.

15

**B.      Dr. Singer's Regression Model Distinguished Between the Impact of Procompetitive and Anticompetitive Conduct**

Zuffa ignores the record below in arguing that Dr. Singer's Wage Share regression cannot distinguish the effects of Zuffa's anticompetitive conduct from those of its potentially procompetitive conduct. Petition 10, 14-17 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)). Dr. Singer performed regression analyses that *controlled* for Zuffa's contributions to revenue, including promotional spending, and demonstrated that they did not explain changes in Zuffa's Wage Share. Supplemental Report of Hal J. Singer ("Singer Supplemental") ¶33 (ECF 534-3); Second Supplemental Report of Hal J. Singer ("Singer Second Supplemental") ¶¶21-33 (ECF 554-3); Order 70 (Dr. Singer's models "control for various alleged neutral or procompetitive factors"); *id*. at 28-29. Indeed, he showed that Zuffa's distinct contributions to event revenues—independent of those of the fighters—had *decreasing* effects over time. Singer Second Supplemental ¶34. He found that what explained variations in Zuffa's Wage Share were changes in its Foreclosure Share. Order 50-51, 70; Singer Rebuttal ¶¶5, 40, 74; Singer Supplemental ¶ 29; Second Singer Supplemental ¶¶34-40. This evidence supports the district court's finding that it was Zuffa's Scheme that caused decreases in its Wage Share, not "some nebulous factor of 'promoter acumen' or 'special sauce of promotion.'" Order 29, 70.

### C. Zuffa Fails to Address the Extensive Documentary and Econometric Evidence of Its Pay Structure

Dr. Singer relied on extensive documentary evidence and statistical analyses demonstrating that Zuffa has a pay structure. That means that any suppression of fighter compensation would transmit across the class. Order 63-66. The district court found that the documentary evidence sufficed by itself to establish a pay structure and classwide impact. Order 64. It also found that Dr. Singer's econometric analyses confirmed a pay structure, and that Dr. Topel's criticisms of that analysis were unpersuasive. *Id*. at 65. Zuffa's mere citation to the rejected conclusions of Dr. Topel in a footnote, Petition 17-18, n.*, provides no basis for a finding of clear error.

## II. THE DISTRICT COURT APPROPRIATELY CERTIFIED A CLASS BASED ON A MODEL THAT CONVINCINGLY DEMONSTRATED COMMON IMPACT

Zuffa mischaracterizes the basis for the district court's endorsement of Dr. Singer's use of Foreclosure Share. Petition 2, 18-19. Dr. Singer measured foreclosure of the market as the proportion of fighters under contracts that met his criteria for long-term exclusivity. Order 45, n.2, 49-51, 57. Zuffa does not deny that long-term contracts can harm competition and violate antitrust law. Instead, it incorrectly claims Plaintiffs relied on a model that "assume[d] the existence of illegal conduct" rather than proved it. Petition 2. It argues (1) 30-month exclusive Contracts are too short to deprive rival promoters of the elite fighters they need to

compete with Zuffa and (2) Dr. Singer assumed rather than showed the Contracts caused anticompetitive harm. *Id*. at 2, 18-19. Zuffa is wrong on both points.

As the district court found, the average length of an MMA career at the UFC is about 30 months. Order 39, 57-58. So an exclusive Contract of that duration is quite long, regardless of how a contract of similar length might operate in other markets. The district court also found Zuffa used various contractual clauses and coercion to extend its contracts with fighters in its sole discretion, so they were in effect *perpetual*. Order 33, 36, 39, 58.

Moreover, Dr. Singer did not *assume* that Zuffa's Contracts were anticompetitive. Instead, he identified them as *potentially* anticompetitive. Reply 9. He then used rigorous statistical analyses to *test empirically* whether Zuffa's use of the Contracts to increase its Foreclosure Share decreased fighter compensation by excluding rivals. Order 46-47. He found it did and the district court agreed. Order 50-51. That provides a sound economic and econometric basis for the court's finding that Dr. Singer appropriately measured Foreclosure Share. Order 67.

## III.   THE DISTRICT COURT SHOULD NOT HOLD THE PETITION PENDING ANY UNRELATED DECISION IN *GOOGLE PLAY*

Zuffa makes a desperate plea for this Court to delay ruling on its Petition until it decides the appeal concerning *In re Google Play Store Antitrust Litig.*, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022). *See In re Google Play Store Antitrust Litig.*, No. 23-15285 (9th Cir.). But that would make no sense for two reasons.

18

First, after Zuffa filed its Petition, this Court in *Google Play* ordered a limited remand based on a ruling by the district court. *In re Google Play Store Antitrust Litig.*, No. 23-15285, ECF No. 123 (9th Cir. August 31, 2023). The Rule 23(f) Petition in *Google Play* may therefore soon become moot.

Second, this case is governed by *Olean* and does not resemble *Google Play*. The plaintiffs in *Olean* relied on the same regression analyses to prove common impact, *Olean*, 31 F.4th at 679 (citing *Tyson Foods*, 577 U.S. at 455), as the Plaintiffs did here for the class of about 1,200 fighters. In *Google Play*, in contrast, the plaintiffs did not perform standard regression analyses to show harm to the tens of millions of class members. *Google Play*, 2022 WL 17252587 at *6-*7. They relied instead on different and unusual models—a logit model and a consumer subsidy model. *Google Play* has no bearing on class certification here.[2]

## IV. THE QUESTIONS AT ISSUE IN THIS CASE WERE RESOLVED BY *OLEAN*, WERE WAIVED BY ZUFFA, LACK AN EVIDENTIARY BASIS, AND CAN MOST EFFICIENTLY BE ADDRESSED AFTER TRIAL

---

[2] Zuffa attempts to blur this crucial distinction by noting the same expert testified for the plaintiffs in *Google Play* as for the Plaintiffs in this litigation. Petition 19-20. But that does not make *Google Play* relevant. At issue in *Google Play* were the contents of Dr. Singer's opinion, not his expertise. Indeed, the same district court judge, Judge Donato, who granted a motion to exclude Dr. Singer's analysis in *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *10 (N.D. Cal. Aug. 28, 2023), had granted class certification in *In re Capacitors Antitrust Litig., (No. III)*, 2018 WL 5980139, at *11 (N.D. Cal. Nov. 14, 2018), and denied a motion to exclude Dr. Singer's testimony based on the same methodologies that Dr. Singer used here and that this Court approved in *Olean*.

Zuffa notes that Plaintiffs' experts relied on "wage share" to assess how much more money its professional MMA fighters would have received absent Zuffa's Scheme. Petition 1-2. Zuffa contends that this approach is "radical" and would cause a flood of litigation by "workers and contractors" generally. *Id*. at 1-2, 20-22. Untrue.

Zuffa suggests that it knows of no court that has ever used Wage Share in a monopsony case, much less in certifying a class. *Id.* at 20-21. But Plaintiffs repeatedly cited below to a district court decision relying on Wage Share in certifying a class in a monopsony case. Supplemental 9 & n.26 (discussing *White v. NCAA*, 2006 WL 8066803) (certifying class based on wage share); Reply 8-9 (same); *cf. Alston v. NCAA*, 141 S. Ct. 2141, 2168 (2021) (Kavanaugh, J., concurring) (doubting antitrust law permits NCAA to use "unpaid student athletes to generate billions of dollars in revenue" rather than pay them "a fair share of the revenues").

More generally, as the district court found, economists routinely use Wage Share to assess compensation *to professional athletes*—particularly in individual sports like boxing and MMA. Order 54-56. It is true that Zuffa retained a labor economist, Dr. Paul Oyer, who contested this use of Wage Share. However, when confronted by numerous economic articles addressing compensation in professional sports, he admitted that they did in fact use Wage Share, HT 5-

150:13-155:6 (ECF 741), that he had never seen them before, *id.*, and that he lacked expertise about professional sports. *Id.* at 5-155:7-15.

One reason Dr. Oyer erred so strikingly was his misinterpretation of a renowned book, MONOPSONY IN MOTION: IMPERFECT COMPETITION IN LABOR MARKETS (Princeton 2005), by an internationally acclaimed labor economist, Professor Alan Manning of the London School of Economics. *Id.* at 5-162:17-163:9. Dr. Oyer discussed MONOPSONY IN MOTION at length in his report, noting that the book did not rely on Wage Share and inferring that its use is therefore inappropriate. *Id.* He rested his opinion in part on his view that MONOPSONY IN MOTION is an authoritative text, *id.* and that Dr. Manning is an authoritative expert on labor economics. *Id.*

Plaintiffs obtained a rebuttal report from Dr. Manning. It revealed that Dr. Oyer misinterpreted Dr. Manning's book, that MONOPSONY IN MOTION did not use Wage Share only because it analyzed compensation to ordinary workers, and that use of Wage Share to analyze MMA fighter pay is appropriate. Reply 7. As Dr. Manning explained, unlike professional athletes, ordinary workers do not have a sufficiently direct effect on a business' revenues for an efficient market to drive compensation toward a percentage of those revenues. Reply 9.

Zuffa is thus wrong that Plaintiffs' experts' reliance on Wage Share is "radical." The authoritative Dr. Manning is not alone in endorsing it. So does the

relevant economic literature on sports. Order 54-55 (citing sports economics publications). So did Zuffa's own expert, Dr. Topel, in assessing compensation to NFL players. *Id*. at 55. So did Zuffa and its bankers in discussing the compensation Zuffa paid its fighters. *Id*. at 54. And two of Zuffa's economists, Drs. Topel and Blair, made the devastating admission at the class certification hearing that changes in Wage Share can properly be used to gauge the effects of changes in monopsony power—the relevant issue in this case. HT-2-148 (ECF 726); HT-3-51 (ECF 730); HT 5-20-24 (ECF 741).

Zuffa claims that the district court's Order would lead to a torrent of worker antitrust claims based on Wage Share. Petition 2, 21-22. But it ignores the court's findings that: (1) Wage Share is appropriate for professional athletes—because they cause discernible changes in revenues—but not for ordinary workers, Order 54-57, and (2) this case relates to a "very specific and unique labor market." *Id*. at 58. That explains why *White v. NCAA*'s certification of a class based on Wage Share many years ago did not open the flood gates to other litigation.

## V. ZUFFA'S CONDUCT IN THE DISTRICT COURT CONFLICTS WITH ITS CLAIM THAT IT FACES GREAT PRESSURE TO SETTLE BEFORE TRIAL

Zuffa suggests that the potential damages from a class trial would "create pressure to settle." Petition 3, 22-23. That assertion conflicts with Zuffa's position in the district court at the very time it was drafting its Rule 23(f) Petition.

22

At a status conference on August 21, 2023, Zuffa contended that the parties should undertake additional discovery in this action—even though the discovery period ended years ago. Def. Response to Pls.' Pre-Conference Statement 2-3 (ECF 843). Zuffa also advocated for trying this action together with a separate proposed class action, one brought on behalf of a different group of Zuffa fighters and in which discovery has not yet begun. *Id*.

Zuffa's proposals would greatly increase the costs of this litigation and the stakes of an eventual class trial. That would make no sense if Zuffa felt coerced to settle this action despite its alleged doubts about the merits of Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, the Petition should be denied.

23

September 5, 2023

By: */s/ Joshua P. Davis*
Joshua P. Davis
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net

Eric L. Cramer
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: +1 (215) 875-3000
Email: ecramer@bm.net

Richard A. Koffman
Benjamin Brown
COHEN MILSTEIN SELLERS &
TOLL, PLLC
1100 New York Ave., N.W., Suite 500
East, Tower
Washington, DC 20005
Telephone: +1 (202) 408-4600
Facsimile: +1 (202) 408-4699
Email: rkoffman@cohenmilstein.com
Email: bbrown@cohenmilstein.com

Joseph R. Saveri (*pro hac vice*)
Kevin E. Rayhill (*pro hac vice*)
JOSEPH SAVERI LAW FIRM, INC.
601 California St., Suite 1000
San Francisco, CA 94108
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: krayhill@saverilawfirm.com

Jerome K. Elwell (*pro hac vice*)
WARNER ANGLE HALLAM
JACKSON & FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: +1 (602) 264-7101
Facsimile: +1 (602) 234-0419
Email: rmaysey@warnerangle.com
Email: jelwell@warnerangle.com

*Attorneys for Respondents-Plaintiffs and
the Certified Class*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** 23-80074

I am the attorney or self-represented party.

**Ninth Circuit Case Number:** 23-80074

**This brief contains 5,178 words,** excluding the items exempted by Fed. R. App. P. 32(f), in compliance with Civ. R. 5. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this briefs has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is 14-point font, Times New Roman.

I certify that this brief complies with the word limit of Cir. R. 32-1.

**Dated:** September 5, 2023

*/s/ Joshua P. Davis*
Joshua P. Davis
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: +1 (415) 906-0684
Email: jdavis@bm.net

26